991 P.2d 840

**Danielle LUAT (Petitioner–Appellee)**

v.

**Alain CACHO (Respondent–Appellant)**

**No. 21432.**

Intermediate Court of Appeals of Hawai'i.

Dec. 8, 1999.

As Amended Dec. 21, 1999.

Renee M.L. Yuen, on the briefs, for respondent-appellant.

Charles K.Y. Khim, on the briefs, for petitioner-appellee.

BURNS, C.J., WATANABE, and ACOBA, JJ.

Opinion of the Court by WATANABE, J.

In this appeal, Respondent–Appellant Alain Cacho (Alain) contends that the District Court of the First Circuit (the district court) committed reversible error when it (1) entered an order on November 24, 1997, enjoining him from harassing Petitioner–Appellee Danielle Luat (Danielle) for a period of three years (injunction order); and (2) denied his motion to reconsider the injunction order (motion to reconsider).

In light of the summary nature of the hearing on Danielle's petition and Alain's denial, at the hearing, of the allegations of harassment, we conclude that the district court should have granted Alain's motion to reconsider and scheduled an evidentiary hearing at which Danielle would have had the burden of establishing, by clear and convincing evidence, that Alain had harassed her. Accordingly, we reverse the order denying Alain's motion to reconsider and remand for further proceedings consistent with this opinion.

## BACKGROUND

On November 10, 1997, Danielle filed against Alain in the district court a "Petition for Ex Parte Temporary Restraining Order [ (TRO) ] and for Injunction Against Harassment." The petition, filed pursuant to Hawai'i Revised Statutes (HRS) § 604–10.5 (1993 & Supp.1998), was prepared on a preprinted district court form, and Danielle had filled in or checked off the blank sections or

boxes on the form in her handwriting. Danielle requested:

a. An ex parte [TRO] not to exceed a period of fifteen (15) days for protection enjoining [Alain] and any other person(s) acting on [Alain's] behalf from:

☑ contacting, threatening, or physically harassing

☑ [Danielle]

☑ Any person(s) residing at [Danielle's] residence

☑ telephoning [Danielle]

☑ entering or visiting [Danielle's] residence, including yard and garage and

☑ place of employment.

b. An order requiring [Alain] to show cause why [Alain] should not be enjoined as stated below.

c. An Injunction not to exceed a period of three (3) years enjoining [Alain] and any other person(s) acting on [Alain's] behalf from committing those acts set forth in paragraph 2a. hereof.

Danielle also requested an "order awarding reasonable attorney's fees and costs to [her] and such further relief as the [c]ourt deems just and appropriate."

In an attached handwritten declaration, Danielle claimed that the following "[r]ecent or past act(s) of harassment" and "[t]hreats of harassment make it probable that acts of harassment may occur soon":

On 10–20–97 I was at work at Oahu [O'ahu] Community Correctional Center [ (O.C.C.C.) ] where I am employed as a Psychiatric Social Worker [ (PSW) ] IV. I was discussing an inmate with two co-workers who are Adults [sic] Corrections Officers [ (ACOs) ] when I felt two hands from either side of my rib cage grab my two breasts. I went into shock then I turned around to see who would touch me when I saw ACO Alain ... behind me, laughing at me. As I had just turned my upper body, I started to scream. I did scream, "Don't touch me!" "How dare you touch me!" He touched me again, same area. I then turned my full body and continued to scream out loud at him, "Who do you think you are?" "I don't like it." One of the ACOs I was talking with called me away from [Alain] so I would stop screaming. I have been experiencing nightmares, emotional distress, lack of appetite, not sleeping well, fear of [Alain] and retribution from him or his friends. On 10–27–97, I reported incident to the [sic] Major Randy Asher—Chief of Security[,] and he said an investigation would be conducted. Meantime I received no relief for my physical person. On 10–31–97 at work I ran across Alain ... who is face to face with me and looked at me in the face and with a smirk on his face[,] gave out a laugh at me and turned around and walked away. I felt intimidated, afraid for my person and threatened. I informed Randy Asher— Chief of Security[,] and the Warden is aware as well. Warden informed me my case is with merit as I had two witnesses and [Alain] was suspended 20 days without pay. [Alain] is to return to work after 20 days but I am in fear of retribution, I am already experiencing emotional distress and I fear further harassment. I know I felt [Alain's] finger-digits press into my sides of my breasts, therefore, he meant to grab my breasts and not something else. I have made a police report on 11–5–97. I am currently working in a very hostile environment[,] and I am having to attend the Sex Abuse Treatment Center for my emotional distress and fear. Police report numbers: 97–432214 2X Sex Assault 4° charges on [Alain]. 97–432215. I already have other guards giving me dirty looks, talking about me for pursuing this. I am under extreme duress! Please, help me. I don't know this man personally, I only work with him. I hardly speak with him except work related, or casually at the workplace. He has repeatedly asked me out on dates[,] and I have repeatedly refused him. That gives him no rights over me. I don't know where he lives. I don't know this man except as co-worker. I would like to petition the court to please don't give out my address nor my phone number to [Alain] because I have two minor children that I fear for as well. My 2 children live with me[,] and I don't want them hurt nor harassed if [Alain] finds out

my address and phone number. I appeal to you for protection. This man has also started spreading slanderous remarks about me around the facility[;] others take up where he leaves off[,] and he has created a hostile work environment. I need to keep safe and sane to continue to work to support my children.

Based on Danielle's *ex parte* petition and pursuant to HRS § 604–10.5, the district court, on the same preprinted form as the petition, found probable cause to believe that "[r]ecent or past acts of harassment have occurred" and that a TRO for Danielle's protection should be granted. The district court's order specifically provided:

> IT IS ORDERED that [Alain] appear before the [j]udge in the above-entitled proceeding at the date, time and place indicated in the attached Notice of Hearing. Pending the hearing on the Order to Show Cause, **IT IS ORDERED** that [Alain] and any person(s) acting on his/her/their behalf shall be enjoined and restrained from:
>
> ☑ Contacting, threatening, or physically harassing [Danielle] and any person(s) residing at [Danielle's] residence
>
> ☑ Telephoning [Danielle]
>
> ☑ Entering or visiting [Danielle's] residence, including yard and garage and
>
> ☑ place of employment.
>
> **[ALAIN] IS PROHIBITED FROM POSSESSING OR CONTROLLING A FIREARM OR AMMUNITION WHILE THIS [TRO] IS IN EFFECT. ANY FIREARM OR AMMUNITION IN THE POSSESSION OF [ALAIN] SHALL BE TURNED OVER TO THE POLICE DEPARTMENT FOR SAFEKEEPING WHILE THIS [TRO] IS IN EFFECT.** This Order becomes effective upon its signing and filing and shall remain in effect for fifteen days. <u>At the hearing on the Order to Show Cause, you will be allowed to give any reason(s) why these Orders should not continue to be effective.</u>
>
> ANY WILLFUL VIOLATION OF THIS [TRO] AGAINST HARASSMENT SHALL BE PUNISHABLE AS CRIMINAL CONTEMPT UNDER [HRS] § 604–10.5.

(Bolding in original; underscoring added.) Below the order was a Notice of Hearing addressed to [Alain], notifying him that Danielle had "filed the attached Petition for Ex Parte [TRO] and for Injunction Against Harassment" and commanding him to appear before the presiding judge of the district court on Monday, November 24, 1997, at 8:30 o'clock A.M. "to show cause why: The [TRO] Against Harassment should not be extended in the form of an Injunction Against Harassment for a term not exceeding three years." Alain was also notified that if he or his attorney failed to attend the hearing, "**AN ORDER GRANTING PETITION FOR INJUNCTION AGAINST HARASSMENT WILL BE TAKEN AGAINST YOU FOR THE RELIEF DEMANDED IN THE PETITION.**" (Bolding in original.)

### THE HEARING ON DANIELLE'S PETITION

Both Danielle and Alain were present at the November 24, 1997 hearing on Danielle's petition. Neither was represented by counsel. At the very outset of the hearing, the district court judge asked the parties, "Do either of you have any witnesses present here in the courtroom?" Alain then replied, "No. . . . I didn't know you could bring witnesses." The district court judge then responded:

> Yup. You can bring witnesses, you can bring an attorney if you want, you can— this is a hearing. It's almost like a trial. It's a lot less formal than a trial, but the objective is the same and that is to get information about the case from both sides so that the [c]ourt can make a proper determination of the outcome.

At that point, the judge asked Danielle whether "everything set forth in [her] petition, . . . is true and correct[.]" Danielle answered the question in the affirmative, and the judge asked whether she had filed a criminal complaint in this matter. Danielle confirmed that she had[1] but stated that she did not know the status of the case because

---

1. It is not clear from the record on appeal whether criminal charges were brought against

I've been busy with [the Equal Opportunity Commission] and others and then—now with the complaint on the hostile environment, I'm trying to do everything.

Upon learning of the pending criminal complaint, the district court advised Alain

to keep in mind that any statements presented during the hearing on the TRO injunction case ... might possibly affect the criminal investigation.

If the prosecutor's office were interested, for example, or the police department, they might request a transcript of this proceeding and see what you said in it, and those statements could be used against you possibly in the criminal matter.

. . . .

... Now, what that means is that you do not, if you choose not to, need to make a statement here today. You may have some Fifth Amendment privilege, for example; however, if you do not make a statement, then I will base my decision on the evidence today. I have to take in the information that is presented today to determine what the outcome should be.

But, once again, in consideration of your rights as to the criminal complaint, it is up to you to decide whether to make a statement or not. . . .

The district court then asked Alain whether he wished to make a statement. The following colloquy then ensued:

[ALAIN]: Yes.

THE COURT: Okay. As to the information set forth in [Danielle's] written declaration, do you disagree fully with all of that information?

[ALAIN]: Yes.

THE COURT: Okay. Do you have a different version of events?

[ALAIN]: I have two witnesses that would corroborate with me that was in that scenario.

THE COURT: But they're not here today?

[ALAIN]: They're not—I didn't know we can call them here today.

THE COURT: Well, what did you think today was for?

[ALAIN]: Well, I mean, I didn't know—I never been to a TRO. I never been to any kind of set [sic] like this before.

THE COURT: Okay. Well, the reality, however, is that when you're commanded to appear in court, it's the time to present your information, normally; and you didn't call the [c]ourt to find out what you could do—you know, there are tape recordings available that indicate what TRO injunction matters involve and other cases as well[2] so you didn't do anything like that, right?

[ALAIN]: Yeah. I didn't know about that.

THE COURT: Okay. So this morning, you're just telling me that it's not true?. [Sic.]

[ALAIN]: Yes.

THE COURT: Okay. Nothing like—like what [Danielle] said happened ever happened?

[ALAIN]: No. Nothing ever happened. I disagree with everything with that.

THE COURT: Okay, and that's it? Is there anything else you wish to say, factually speaking?

[ALAIN]: Well, I didn't do it. I mean, there was a touch, but the touch wasn't where she said it was; and on the police reports, it'll say the same thing. The two witnesses would corroborate with me.

THE COURT: It wasn't where [Danielle] says, okay. Where was it, then?

[ALAIN]: Yes, there was a touch—well, that was in the lower back, right there.

THE COURT: And why did you touch [Danielle]?

[ALAIN]: I was trying to get to the HCO [sic] that was sitting down that was talking to her. I was trying to tell her

Respondent–Appellant Alain Cacho (Alain), based on the complaint filed by Petitioner–Appellee Danielle Luat (Danielle), and, if so, what the charges were.

2. There is no indication in the record as to what tape recordings the court was referring to, what the contents of the tape recordings were, or whether Alain was ever notified of the existence of the tape recordings.

excuse me, I need to talk to the HCO [sic]. I forgot the reason why I needed to talk to him, but there was a situation that I need [sic] to talk to him.

And I kept asking her excuse me, oh Danielle, could I please talk to ... him; and, you know, and she didn't respond back to me.

THE COURT: I'm sorry. What did you say to [Danielle]?

[ALAIN]: I said—I called her, I said excuse me, can I please talk to the HCO [sic] or I said excuse me, Danielle—said excuse me, can I please talk to him alone and there was no response to it. There was no response back.

THE COURT: So you tapped her or something?

[ALAIN]: I tapped her on the back and said excuse me. She turned around, looked at me, and I said could I please talk to Stacey O'Dunn (phonetic), that was the HCO's [sic] name.

THE COURT: Well, how about—how about the latter incident that [Danielle] writes about where you folks ran across each other and you kind of looked at her—

[ALAIN]: I—

THE COURT:—and laughed?

[ALAIN]: I never looked at her. I always keep my head down. I was advised not even to even look at her or to make a comment or even a gesture to her, so I haven't done anything to—that was given to me by my superior, so I have not disobeyed the order. I haven't—

THE COURT: And you never asked out [Danielle]?

[ALAIN]: No. She—she—*if it does come to trial, I have several witnesses saying that she had asked me out.* She has touched me, and she has told the facility that I was her boyfriend in a joking matter or in any other matter; but she did say that to other people that worked there and so she's told everybody that. She's touched me a lot. I mean, just common touches here and there, and she walks with me to lunch, or—but I've never asked her out.

THE COURT: So you're saying that there is or that there has been a prior friendship between you?

[ALAIN]: Oh yeah. We have a mutual friend, we have a mutual friend.

THE COURT: Who is—

[ALAIN]: He works at the facility. His name is Moses (phonetic). We both know that person.

THE COURT: And—

[ALAIN]:—that's how I think our friendship started because of our mutual friendship; I mean, that person we know.

THE COURT: And what's the nature of your friendship? You just eat lunch together?

[ALAIN]: No. We never had lunch. We just—it's just like a working friendship.

THE COURT: Okay. All right. Anything further, [Alain]?

[ALAIN]: No.

(Footnote and emphasis added.) The district court thereafter began questioning Danielle:

THE COURT: All right. [Danielle], you've heard the statements made by [Alain] in response to your petition. Would you address those areas that you have disagreement with, please?

[DANIELLE]: I disagree with everything. I have a statement here from—from one of the witnesses that—don't know if this will count, but I wasn't—he never even said excuse me.

THE COURT: Well, neither party has any witnesses live here in the courtroom so it's very difficult for me to assess any outside statement, since I can't look at the person and ask that person any questions. They're not here. But from your prospective [sic], anyway, can you respond?

[DANIELLE]: He's turned everything around, and nothing he said is true.

THE COURT: Is there or was there a prior friendship?

[DANIELLE]: No, sir, nothing with his co-worker. I think I've talked with him three times at the most and that's work related.

THE COURT: Okay. What about the—

[DANIELLE]:—he has asked me out, I have repeatedly said no; but that doesn't give him a right to go and grab me.

THE COURT: Okay. Anything further that you wish to say about the incident of October 20? That's the first thing that was described in your declaration.

. . . .

[DANIELLE]: I want to say what happened that day, but it's in the statement, okay.

THE COURT: Okay. All right. That's fine.

. . . .

THE COURT: My question was whether you had anything further you wanted to add in light of what [Alain] had said.

[DANIELLE]: No, sir. I'd just like to add one thing that I am under medical care as an emotional—that I—the emotional damage it has caused me in this incident.

THE COURT: Okay.

[DANIELLE]: And I am very much physically and emotionally afraid of him.

THE COURT: But you're still working full time at the facility?

[DANIELLE]: I have—do take out stress leave—have taken stress leave due to this incident and to seek medical attention; but I'm still employed, yes, sir. I've been there for four years.

THE COURT: And the stress leave has been within the last months or so?

[DANIELLE]: Right.

THE COURT: Since the incident occurred?

[DANIELLE]: Since the incident, I've been taking some stress leave. And it's for the—being for the—by the hostile environment that this has created with the other—with the talk and—

THE COURT:—prior to the incident, you did not have any of these?

[DANIELLE]: I had—no, nothing like this, sir.

Immediately thereafter, the district court ruled as follows:

The [c]ourt has listened to what both sides have had to say. The [c]ourt has reviewed the petition and there are no outside witnesses, so it's just basically reviewing the testimony that has been presented.

The [c]ourt views the information set forth in the declaration as supported by the testimony presented this morning to be supported by clear and convincing evidence. Therefore, the [c]ourt makes an affirmative determination that harassment has occurred, as defined by HRS [§] 604-10.5. The injunction will here, now, issue; and are you asking for three years—the term of the injunction?

Following Danielle's affirmative response to the court's question, Alain said: "I got a question." The district court then stated: "Now is not the time for questions. I'm giving you my decision. The injunction will issue. It will be in effect for three years." The district court then went on to prescribe the terms and conditions that Alain was required to comply with during the three-year period the injunction would be in effect. Special Condition No. 5 was that "the firearms ammunition restriction . . . that was already in the TRO" would continue for the next three years.

█ The district court did not, in accordance with Hawai'i District Court Rules of Civil Procedure Rule 52(a) and (c),[3] enter any

---

3. Hawai'i District Court Rules of Civil Procedure Rule 52(a) and (c) provide, in relevant part:

**Rule 52. FINDINGS BY THE COURT.**

(a) **Effect.** In all actions tried upon the facts, the court upon request of any party shall find the facts specially and state separately its conclusions of law thereon. Judgment shall be entered pursuant to Rule 58. Unless findings are requested, the court shall not be required to make findings of fact and conclusions of law. If an opinion or memorandum of decision is filed, stating the facts and the court's opinion on the law, it will be unnecessary to make other findings of fact and conclusions of law. Findings of fact and conclusions of law are unnecessary on decisions of motions except as provided in Rule 41(b).

. . . .

(c) **When Judgment is Appealed.** Whenever a notice of appeal is filed and findings of fact and conclusions of law have not been made, unless such findings and conclusions are unnecessary as provided by subdivision (a) of this rule, the court shall find the facts specially and state separately its conclusions of law thereon. Notwithstanding the filing of the

specific factual findings or legal conclusions as to whether Danielle had proved harassment under HRS § 604–10.5(a)(1) or (a)(2).

## ALAIN'S MOTION TO RECONSIDER

On December 3, 1997, Alain, through his attorney, filed a motion requesting that the district court reconsider, or in the alternative, modify its injunction order. In a memorandum in support of his motion, Alain stated that after the hearing on Danielle's petition for an injunction order against harassment, he learned that Danielle had filed claims of harassment against two other ACOs within the state prison system. Additionally, while Danielle was employed at the Office of the Prosecuting Attorney, she had filed a claim of harassment against a fellow employee. Alain also discovered that the two eyewitnesses to the October 20, 1997 incident to whom he had orally referred at the earlier hearing had made written statements corroborating Alain's version of the incident. Copies of these statements were attached to Alain's motion.

The first statement, handwritten by ACO Bernard Thomsen (ACO Thomsen) on a "Department of Public Safety Incident Report" form,[4] explained as follows:

> On [October] 20, 1997 at about 11:15 a.m.[,] I was talking with ACO [Dana] Gunn [(ACO Gunn)] in Station 1 when PSW Danielle ... came by to give me an admission paper for an inmate who was to be placed on suicide watch in Module 4.
>
> While Danielle and I were talking[,] [Alain] came up from behind her and poked her on the sides of her stomach[,] startling her. She turned to [Alain] and

said don't do that again. But [Alain] poked her again on the side, below her ribs at the waist area.

> Danielle ... seemed upset so I walked with her out of the station before she does anything to cause embarassment [sic] to the ACO.

In the second statement, dated November 26, 1997, ACO Gunn recounted in his handwriting, his recollection of the October 20, 1997 incident:

> I was assigned to Station One of [O.C.C.C.]. While I was there, another [ACO] was with me. His name is Ben Thompsen [sic] (ACO [Thomsen]). This was around 1045[sic] a.m. on October 20th.
>
> We were talking with [PSW Danielle. S]he was asking [ACO Thomsen] to take some paperwork back to Module Four, of O.C.C.C., where [ACO Thomsen] was assigned.
>
> [Alain] happened to walk through Station One area at this time. He saw [Danielle] and jokingly touched her on the back. He touched her in lower back area above hip line. [Danielle] made some kind of statement[.] I do not recall exactly but to the effect of, don't do that, or stop it. I didn't hear her well, as she didn't speak to [sic] loudly. [Alain], jokingly smiling/laughing, touched her again in the same area.
>
> I interpreted these actions as playful behaviour [sic], but told [Alain] to clear the area. I wasn't sure if [Danielle] was serious or not. [Alain] cleared the area and went about his bussiness [sic], without further incident.

notice of appeal, the court shall retain jurisdiction to make and file such findings and conclusions and to amend the judgment to conform thereto, if deemed necessary.

In this case, no motion was involved and the district court did not file an opinion or memorandum of decision following the hearing on Danielle's petition for an injunction order against harassment. Consequently, "findings [of fact] and conclusions [of law were] seemingly necessary[,]" once the notice of appeal was filed. *See Richards v. Kailua Auto Machine Service,* 10 Haw.App. 613, 619, 880 P.2d 1233, 1237 (1994). Although such findings and conclusions "are not jurisdictional and the appellate court may proceed where the record is clear and findings are

unnecessary," *id.,* it is preferable for the district court to enter such findings and conclusions once an appeal is filed.

**4.** It is not clear from the record what circumstances prompted the two Adult Corrections Officers (ACOs) who had witnessed the October 20, 1997 incident between Alain and Danielle to prepare the statements. However, it appears that after the incident occurred, the State of Hawai'i, Department of Public Safety conducted an internal investigation into the incident and the statements of the ACOs were prepared as part of that investigation.

At the hearing on the motion held on December 22, 1997, both Alain and Danielle appeared, along with their respective counsel. Alain's counsel represented that several of the witnesses who had been subpoenaed to appear at the hearing were outside the courtroom. However, the district court refused to grant Alain's motion for reconsideration and the witnesses were not allowed to testify. The district court judge explained that he had read the written reports of the eyewitnesses to the incident, and the reports were consistent with the evidence presented at the prior hearing. When Alain's counsel pointed out that the witnesses' accounts of *where* Alain had touched Danielle differed from Danielle's statement that Alain had "touched her breasts," the court stated:

I know you folks weren't at the hearing, but we did have a hearing; and I went through and I asked a series of questions, and I was satisfied in my mind that there was a touching because I addressed that issue.

Where was the touching? Where did it occur? It was down at the sides, consistent with what these people said in their written statements; and [Danielle] said don't do that and [Alain] allegedly did it again, and I found that that was established based upon my resolution of issues of credibility that [Danielle's] representations, factually speaking, were established.

Then there was a subsequent contact in which facial expression, you know, the sneering type of thing was—had occurred, and I found that to be a sufficient basis by clear and convincing evidence for the issuance of the injunction order.

*Counsel should also be aware that where there is generally a benefit of doubt, as long as the [c]ourt feels that there is clear and convincing evidence, we're going to resolve things in favor of the issuance of an injunction in the interest of public safety.*

So, that having been said, nothing based on my initial reading of the petition, based on my clarification of the factual scenario, after questioning [Danielle] and [Alain] and hearing with the factual conclusions that I drew, the findings that I made and

the conclusions that I drew, these written statements are consistent with what I heard at the hearing.

. . . .

The witnesses that were there, the independent witnesses, themselves, confirm what I heard the parties state at the hearing. There was one touch, [Danielle] says no, don't do it again, there was another one. That's part of the pattern. What happened at that moment wasn't simply enough, but there was a whole lot of other things that were said that day.

(Emphasis added.)

Alain's counsel argued thereafter:

Your Honor, I would like to make one further statement. What we're dealing with at this particular hearing is commonly called extraordinary relief. The granting of injunctive relief is considered extraordinary relief.

And by its very terms, the factual circumstances that are presented must be extraordinary. In this particular case, what we're talking about is not something where somebody's in danger of becoming physically harmed or anything like that.

We're talking about a mere placing of hands on a particular area that for all intents and purposes, might not be offensive to 99 percent of the people. And under these circumstances, if the [c]ourt is saying that in every case, this particular scenario, a touching of this nature constitutes a basis for the granting of a temporary restraining order or injunctive relief, then I say to the [c]ourt that that is misplaced.

The [c]ourt must consider the circumstances, the individuals involved. And we submit to the [c]ourt that the [c]ourt should allow us to present our evidence at least on the motion to reconsider to see if we can persuade the [c]ourt that these circumstances do not, in fact, justify extraordinary relief.

In response to the foregoing argument, the district court ruled:

[Alain's counsel], I would ordinarily agree with you as to the injunctive relief milieu the way in which that type of relief—

equitable relief is viewed; but *I would submit that in TRO injunction cases where either physical safety or mental well[-]being or both are at issue, it—the animal takes on a little different character in the [d]istrict [c]ourt's view.*

*We have [sic] unfortunate society in which there are situations where people do feel adversely affected in their mental well[-]being. And in a sense, you have to take the petitioner as you find her or him.* That does make a big difference. In this case, I did have a chance at a hearing which covered some time to view the credibility, the demeanor, the attitude of both parties.

And there was a concern to me as to whether [Danielle] would be able to have continued comfort and mental well[-]being within her employment environment given the circumstances which were shown to have occurred at the hearing that took place in this case.

On that basis by clear and convincing evidence, the [c]ourt did determine that an injunction should issue involving these two individuals, that is[, Alain] would have to remain away from [Danielle]; and we did put a distance requirement in prohibiting intentional coming into contact within so many feet of each other, based upon the quite extensive information that was derived at the hearing.

Viewing the basis upon which reconsideration is requested, first of all, as to the new evidence that there are prior complaints of a similar nature which have been registered, perhaps such information could be considered as part of a modus operandi or proof of intent or motive or what have you.

But, again, even if that information was allowed, the [c]ourt is of the view that looking solely at this instance and what the [c]ourt was presented with at the prior hearing, and again viewing the demeanor, the attitude, and the credibility of the parties, the [c]ourt would not be swayed with any outside evidence of that nature.

Further, [Alain] was duly summoned to appear at the last hearing, was given an opportunity to present evidence, had not asked for a continuance until subsequent to the evidentiary hearing having taken place, and the [c]ourt sees no proper basis upon which to grant a motion to reconsider the order which previously granted the petition for injunction.

So, again, solely as between these individuals, the petition which was granted earlier, or the granting of the petition, shall stand and the motion to reconsider must be and hereby is denied.

(Emphases added.)

At that point, Alain's counsel asked for clarification from the district court as to which subsection of HRS § 604–10.5 the court was basing its ruling on. The court responded as follows: "It's the course of conduct part because I didn't necessarily consider the touching to be an assault or something that threatened bodily injury in and of itself."

On February 11, 1998, the district court entered a written order denying Alain's motion for reconsideration. On March 12, 1998, Alain filed this appeal.

## DISCUSSION

A. *The Requirements for Issuance of an Injunction Under HRS § 604–10.5*

HRS § 604–10.5 provides, in relevant part, as follows:

**Power to enjoin and temporarily restrain harassment.** (a) For the purposes of this section:

*"Course of conduct" means a pattern of conduct composed of a series of acts over any period of time evidencing a continuity of purpose.*

*"Harassment" means:*

(1) Physical harm, bodily injury, assault, or the threat of imminent physical harm, bodily injury, or assault; or

(2) *An intentional or knowing course of conduct directed at an individual that seriously alarms or disturbs consistently or continually bothers the individual, and that serves no legitimate purpose; provided that such course of conduct would cause*

*a reasonable person to suffer emotional distress.*

(b) The district courts shall have power to enjoin or prohibit or temporarily restrain harassment.

(c) Any person who has been subjected to harassment may petition the district court of the district in which the petitioner resides for a temporary restraining order and an injunction from further harassment.

(d) A petition for relief from harassment shall be in writing and shall allege that a recent past act or acts of harassment may have occurred, or that threats of harassment make it probable that acts of harassment may be imminent; and shall be accompanied by an affidavit made under oath or statement made under penalty of perjury stating the specific facts and circumstances from which relief is sought.

(e) Upon petition to a district court under this section, the court may temporarily restrain for a period of fifteen days, persons named in the petition from harassing the petitioner if the alleged harassment has caused the petitioner substantial emotional distress. The court may issue an ex parte temporary restraining order either in writing or orally, provided that oral orders shall be reduced to writing by the close of the next court day following oral issuance.

(f) *A hearing on the petition to enjoin harassment shall be held within fifteen days after it is filed. The parties named in the petition may file responses explaining, excusing, justifying, or denying the alleged act or acts of harassment. The court shall receive such evidence as is relevant at the hearing, and may make independent inquiry.*

*If the court finds by clear and convincing evidence that harassment as defined in* paragraph (1) of that definition exists, it may enjoin for no more than three years further harassment of the petitioner, or that harassment as defined in *paragraph (2) of that definition exists, it shall enjoin for no more than three years further harassment of the petitioner;* provided that this paragraph shall not prohibit the court from issuing other injunctions against the named parties even if the time to which the injunction applies exceeds a total of three years.

Any order issued under this subsection shall be served by regular mail upon the chief of police of each county.

(Emphases added.)

Pursuant to HRS § 604–10.5, a district court may issue a fifteen-day TRO, *ex parte*, based solely on the sufficiency of a written petition for relief from harassment and a supporting affidavit. Thereafter, according to subsection (f) of HRS § 604–10.5,

> [a] hearing on the petition to enjoin harassment shall be held within fifteen days after it is filed. The parties named in the petition may file responses explaining, excusing, justifying, or denying the alleged act or acts of harassment. The court shall receive such evidence as is relevant at the hearing, and may make independent inquiry.
>
> . . . .

Pursuant to the clear language of HRS § 604–10.5(a), the district court is authorized, but not required, to grant an injunction if it finds "by clear and convincing evidence" that harassment as defined in paragraph (1) exists. If the district court finds "by clear and convincing evidence" that harassment as defined in paragraph (2) exists, however, it is *mandated* to enter an injunction.

In this case, the district court expressly held that Alain's admitted touching of Danielle did not constitute "harassment" as that term was defined in paragraph (1) of the harassment definition set forth in HRS § 604–10.5(a) because there was no evidence of "an assault or something that threatened bodily injury in and of itself." The district court concluded, however, that harassment under paragraph (2) of the harassment definition had been established by clear and convincing evidence. We examine, therefore, what elements must be present to constitute harassment under paragraph (2), thus triggering the requirement that an injunction be issued to prevent such harassment from continuing.

### 1.

■ HRS § 604–10.5 had its genesis in 1986 Haw. Sess. L. Act 69, § 1 at 70, which, in turn, had its genesis in Senate Bill No. 1023, entitled, "A Bill for an Act Relating to the Courts." As originally enacted, the only definition of harassment included in Act 69 was that which is now codified in paragraph (2) of the statutory harassment definition.[5] A review of the legislative history of Act 69 provides some insight into the type of harassment that the legislature was attempting to control with the passage of the Act.

According to the Senate Judiciary Committee, the purpose of Senate Bill No. 1023 was "to prevent harassment that cannot be effectively controlled by criminal processes and penalties" and to adopt a "civil statute that can be used to interrupt systematic and continuous intimidation that stops short assault or threats." Sen. Stand. Comm. Rep. No. 19–86, in 1986 Senate Journal, at 780. The Committee observed that "civil harassment is an all too common occurrence with seriously damaging effects on the victim's life and well-being." Sen. Stand. Comm. Rep. No. 493–86, in 1986 Senate Journal, at 1005. The Committee specifically emphasized, however, that the Act was not intended to "curtail or deter conduct that has a legitimate purpose." The Committee also expressed confidence that "[t]he courts will have no difficulty distinguishing permissible activities from the focused, disruptive behavior that this bill addresses." *Id.*

The House Judiciary Committee noted that the purpose of Senate Bill No. 1023 was "to allow the victims of intentional harassment to petition the district court for temporary restraining orders and injunctions to prevent the continuation of such acts." Hse. Stand. Comm. Rep. No. 761–86, in 1986 House Journal, at 1369. As an example of the type of harassment the bill was intended to prevent, the House Committee referred to the testimony by a woman that "she ha[d]

been the victim of continuous harassment since 1979, and has been unable to legally stop these sometimes violent acts." *Id.*

In 1992, HRS § 604–10.5 was amended by 1992 Haw. Sess. L. Act 291, § 1 at 751, to make a "knowing or intentional violation of a restraining order or injunction" issued pursuant to the statute a misdemeanor and to provide for criminal penalties, including mandatory imprisonment, to be imposed for such a violation.

Based on the language and legislative history of HRS § 604–10.5, we conclude that the type of harassment that the courts are mandated to restrain or enjoin under paragraph (2) involves an intentional or knowing pattern of conduct composed of a series of acts over any period of time and evidencing a continuity of purpose that is not legitimate, and is directed at, seriously alarms, disturbs consistently, or continually bothers an individual and would cause a reasonable person to suffer emotional distress. It is conduct that involves systematic and continuous intimidation that stops short of assault or threats and cannot be controlled effectively by resort to criminal processes and penalties.

### 2.

HRS § 604–10.5 requires that the clear and convincing standard of proof be applied in determining whether conduct rises to the level of paragraph (2) harassment.

■ The Hawai'i Supreme Court has stated that clear and convincing evidence is

> an intermediate standard of proof greater than a preponderance of the evidence, but less than proof beyond a reasonable doubt required in criminal cases. It is that degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established, and requires the existence of a fact be highly probable.

---

**5.** The definition of harassment that is currently included in paragraph (1) of the harassment definition set forth in Hawai'i Revised Statutes (HRS) § 604–10.5 (1993 & Supp.1998) was added to the statute by 1996 Haw. Sess. L. Act 243, § 1 at 549. The legislative history of the 1996 amendment clarifies that the legislature intended to give the courts the permissive authority to enjoin and temporarily restrain harassment when it is committed by "a single act of physical harm, bodily injury, assault, or by the threat thereof." Sen. Stand. Comm. Rep. No. 2617 on House Bill No. 3653, in 1996 Senate Journal, at 1218.

*Masaki v. General Motors Corp.,* 71 Haw. 1, 15, 780 P.2d 566, 574, *reconsideration denied,* 71 Haw. 664, 833 P.2d 899 (1989). It is a standard frequently imposed in civil cases where the wisdom of experience has demonstrated the need for greater certainty, and where this high standard is required to sustain claims which have serious social consequences or harsh or far reaching effects on individuals to prove willful, wrongful and unlawful acts to justify an exceptional judicial remedy[.]

*Id.* at 15–16, 780 P.2d at 575 (quoting *Travelers Indem. Co. v. Armstrong,* 442 N.E.2d 349, 360 (Ind.1982)). Under the clear and convincing standard of proof,

the interests of the alleged wrongdoer are deemed to be more substantial. Thus, the clear and convincing proof standard reduces the risk to the alleged wrongdoer of having his or her reputation tarnished erroneously by increasing the plaintiff's burden of proof. In this manner, the "standard of proof serves to allocate the risk of error between the litigants and to indicate the relative importance attached to the ultimate decision."

... [U]nder a clear and convincing standard of proof, an alleged [victim] would carry a heavy burden in proving that a protective order should issue.

*Coyle v. Compton,* 85 Hawai'i 197, 208, 940 P.2d 404, 415 (App.1997) (citations and internal brackets omitted).

■ In contrast, the preponderance of the evidence standard is defined as proof which leads the trier of fact to find that "the existence of the contested fact is more probable than its nonexistence." *Masaki,* 71 Haw. at 14, 780 P.2d at 574 (citation omitted). Under this standard,

the parties share the risks of an erroneous verdict in roughly equal fashion. . . . [T]o prevail, "a plaintiff need only offer evidence sufficient to tip the scale slightly in his or her favor, and a defendant can succeed by merely keeping the scale evenly balanced."

*Id.* (citations and internal brackets omitted).

### 3.

■ According to HRS § 604–10.5, a particular course of conduct constitutes paragraph (2) harassment only if it "would cause a reasonable person to suffer emotional distress." The reasonable person standard is an objective one and a trial court's determination regarding whether a reasonable person would suffer emotional distress as a result of a course of conduct is reviewed on appeal *de novo. See State v. Trainor,* 83 Hawai'i 250, 255, 925 P.2d 818, 823 (1996) (holding that "[w]hether a reasonable person would feel free to leave is determined under an objective standard that [an appellate court] reviews *de novo "*). Under the objective standard, we are required to determine whether "a reasonable person, normally constituted," would have suffered emotional distress as a result of a particular course of conduct. *Tabieros v. Clark Equip. Co.,* 85 Hawai'i 336, 362, 944 P.2d 1279, 1305 (1997). Stated otherwise, any emotional distress allegedly suffered by Danielle must be "within the range of that experienced by a reasonable person under the same circumstances." *John & Jane Roes v. FHP, Inc.,* 91 Hawai'i 470, 477, 985 P.2d 661, 668 (1999).

### B. *Whether the Statutory Requirements for Issuance of an Injunction Under HRS § 604–10.5(b) Were Present in This Case*

We have a number of concerns, both substantive and procedural, about whether the district court properly issued the injunction order against Alain in this case.

### 1.

■ We note, first of all, that the TRO signed by the district court and served on Alain specifically "commanded" Alain

to appear before the [p]residing [j]udge of the above-entitled [c]ourt, the [d]istrict [c]ourt of the above [c]ircuit, at 1111 Alakea Street, 10th floor, Courtrooms A or B, Honolulu, Hawai'i 96813, on Monday, November 24, 1997 at 8:30 o'clock A.M. *to show cause why:*

*The Temporary Restraining Order Against Harassment should not be extended in the form of an Injunction*

*Against Harassment for a term not exceeding three years.*

(Emphasis added.) By using the words "show cause" in the notice, the district court improperly implied that the burden was on Alain to disprove the allegations against him, rather than on Danielle to prove her allegations by clear and convincing evidence. *See Kie v. McMahel,* 91 Hawai'i 438, 442, 984 P.2d 1264, 1268 (App.1999) (holding that although HRS § 586–5.5 (1993), which governs protective orders in domestic abuse cases, provides that the family court may order a protective order "if the court finds that 'the respondent has failed to show cause why the TRO should not be continued[,]' " the "burden remains on the petitioner to prove the petitioner's underlying allegations by a preponderance of the evidence"). (Internal brackets deleted.)

■ Moreover, at the hearing on the motion for reconsideration, the district court explained that in cases under HRS § 604–10.5, "where there is generally a benefit of doubt, as long as the [c]ourt feels that there is clear and convincing evidence, we're going to resolve things in favor of the issuance of an injunction in the interest of public safety." The court also stated that while an injunction is ordinarily not granted except in extraordinary circumstances, "in TRO injunction cases where either physical safety or mental well[-]being or both are at issue, it—the animal takes on a little different character[.]"

The district court's statements are consistent with the preponderance, rather than the clear and convincing standard of proof. Although the district court used the term "clear and convincing evidence" in announcing its decision, the court's statement that "where there is generally a benefit of doubt," the court would "resolve things in favor of the issuance of an injunction in the interest of public safety," reflects a misapprehension of the clear and convincing standard of proof imposed on Danielle by HRS § 604–10.5.

### 2.

In her petition and at the initial hearing on her petition, Danielle asserted that Alain had pressed his "finger-digits" into the sides of her breasts twice and that "he meant to grab

[her] breasts." She also claimed that Alain had smirked and laughed at her when he passed her after the incident. Alain admitted that he had "touched" Danielle twice in the back on the occasion in question, but only to gain her attention and interrupt her conversation with another ACO to whom he needed to talk. He also insisted that after the incident, he always looked down when he passed Danielle because he had been instructed to do so by his superiors. Alain also maintained that he had witnesses who could verify that Danielle "touched [him] a lot," "asked [him] out," and joked to others that he "was her boyfriend."

The two ACOs who witnessed the October 20, 1997 incident wrote statements that confirmed that although Alain touched Danielle in the back, he did not touch her breasts. One ACO interpreted Alain's actions as "playful" and stated that Alain was "jokingly smiling/laughing" when he touched Danielle a second time "in the lower back area above hip line." Both ACOs reported that after Alain had touched Danielle, she said, "Don't do that[.]" and seemed upset. ACO Thomsen stated that in response to Danielle's reaction, he walked Danielle "out of the station before she does anything to cause embarassment [sic] to [Alain]." ACO Gunn reported that because he wasn't sure if Danielle was serious when she said, "[D]on't do that[.]" or "[S]top it[.]," he asked Alain to clear the area, and Alain "cleared the area and went about his bussiness [sic], without further incident." The statements suggest that the ACO witnesses were somewhat surprised by Danielle's reaction and immediately took action to diffuse the situation and get Alain to leave the area.

In concluding that harassment as defined in paragraph (2) had been established by clear and convincing evidence, the district court, although agreeing with Alain that he had not touched Danielle's breasts, concluded that Alain's touching of Danielle down her sides, coupled with the laugh and smirk, constituted a course of conduct that amounted to harassment. Alain's counsel argued that harassment had not been established because the "mere placing of hands on a particular

area ... might not be offensive to 99 percent of the people."

However, the district court responded: "We have [sic] unfortunate society in which there are situations where people do feel adversely affected in their mental well[-]being. And in a sense, *you have to take the petitioner as you find her or him.* That does make a big difference."

■ It appears from the foregoing statement that the district court erroneously applied a subjective, rather than the objective, reasonable person standard in evaluating whether Alain's conduct caused Danielle emotional distress. Pursuant to HRS § 604-10.5, however, the district court should have evaluated whether Alain's course of conduct would have caused a reasonable person, normally constituted, to have suffered emotional distress in Danielle's situation.

### 3.

■ We also conclude that the procedure used by the district court in issuing the injunction order was flawed and deprived Alain of his right to due process under the United States and Hawai'i constitutions.[6]

Under the statutory scheme, a district court may issue, *ex parte*, a fifteen-day TRO, based solely on the allegations contained in a written petition for relief from harassment. A hearing on the petition is required to be held "within fifteen days after [the petition] is filed." Therefore, even if the respondent has not been served with notice of the hearing, the hearing must be held. In this case, for example, Danielle filed her petition on November 10, 1997. The TRO signed by the district court judge notified Alain that the hearing on Danielle's petition would be held at 8:30 a.m. on Monday, November 24, 1997, fourteen days after the filing of the petition. Alain was not served with the TRO, however, until "2140 hours", i.e., 9:40 p.m., on November 13, 1997. Effectively, then, Alain had only ten calendar days to prepare for the hearing.

Under subsection (f), the "parties named in the petition may file responses explaining, excusing, justifying, or denying the alleged act or acts of harassment." Subsection (f) also provides that the district court "shall receive such evidence as is relevant at the hearing" on the injunction petition. However, the statute does not state when such responses are due and the TRO served on Alain, which was prepared on a standard district court form, did not notify Alain of his right to file a response or set forth a due date for any response.

The TRO served on Alain also failed to inform Alain that he was entitled to an evidentiary hearing on Danielle's petition if he contested or denied the allegations in the petition. Indeed, the TRO specifically instructed:

> **This Order becomes effective upon its signing and filing and shall remain in effect for fifteen days. At the hearing on the Order to Show Cause, *you will be allowed to give any reason(s) why these Orders should not continue to be effective.***

(Bolding in original; emphasis added.) By informing Alain that at the hearing, he would be allowed to give *reasons* why the TRO should not be continued, Alain was essentially told that he could present only legal arguments at the hearing. Cf. *Kie v. McMahel,* 91 Hawai'i at 438, 984 P.2d at 1264, discussing the requirements for issuance of an injunction against domestic abuse under HRS § 586-5.5 (Supp.1997) in a case in which the TRO did advise the respondent of his procedural rights at the order to show cause hearing.

It is not surprising, therefore, that at the initial hearing on Danielle's petition, Alain was unaware that he could have witnesses present to testify and seemed to believe that the hearing was akin to a criminal arraignment hearing and that once he denied Danielle's charge against him, he would be given a trial date and be allowed to bring witnesses to trial to testify in his support.

---

6. The Fifth Amendment of the United States Constitution provides that "[n]o person shall ... be deprived of ... liberty or property, without due process of law." A similar right is provided under Article I, section 5 of the Hawai'i Constitution.

4.

An injunction issued pursuant to HRS § 604-10.5 may result in severe personal consequences for the individual enjoined. It infringes, first of all, upon the enjoined individual's freedom of movement, a fundamental right guaranteed by the Hawai'i Constitution. Cf. *Compton*, 85 Hawai'i at 206, 940 P.2d at 414 (holding that a protective order against abuse by a family or household member pursuant to HRS chapter 586 "appear[s] to impinge upon a person's fundamental freedom of movement").

 Additionally, where a respondent has been charged with a criminal offense arising out of the same course of conduct alleged in a petition for injunction pursuant to HRS § 604-10.5, any statements made by the respondent in the HRS § 604-10.5 proceeding may be used against the respondent in the criminal case.

 While a TRO, in view of its emergency remedial nature, may be granted *ex parte*, a respondent who, either orally or in writing, denies or controverts the material allegations contained in a petition for injunction under HRS § 604-10.5 is statutorily and constitutionally entitled to a prior evidentiary hearing before a three-year injunction order may issue.

 Given the serious consequences that may flow from such an injunction order, a respondent must be given a reasonable time to obtain the services of a lawyer, conduct discovery, obtain documentary and testimonial evidence, and prepare a proper defense to the allegations raised in the petition.

C. *The Order Denying Alain's Motion for Reconsideration*

At the initial hearing on Danielle's petition, Alain orally denied Danielle's allegations of harassment. He also stated that he had witnesses who would testify in support of his version of what transpired on October 20, 1997.

In granting Danielle's petition for a three-year injunction order against Alain, the district court remarked that "neither party has any witnesses live here in the courtroom so it's very difficult for me to assess any outside statement, since I can't look at the person and ask that person any questions."

 Because the TRO served on Alain did not advise him that he was entitled to an evidentiary hearing on Danielle's petition and Alain, at the hearing, denied the allegations contained in the petition, the district court should have *sua sponte* continued the TRO and the hearing in order to allow Alain the opportunity to adduce evidence and witnesses critical to his defense. At the evidentiary hearing, Danielle would have the burden of establishing, by clear and convincing evidence, that Alain had harassed her.

 Since the district court entered the injunction order without affording Alain an evidentiary hearing, we conclude that the district court should have granted Alain's subsequent motion for reconsideration of the injunction order.

## CONCLUSION

In light of the foregoing discussion, we reverse the district court's February 11, 1998 order denying Alain's motion for reconsideration of the injunction order entered by the district court on November 24, 1997 and remand for further proceedings consistent with this opinion. We also recommend that the TRO forms currently being used for proceedings under HRS § 604-10.5 be revised to address the deficiencies discussed in this opinion.